UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
SINGAPORE RECYCLE CENTRE
PTE LTD.,

              Plaintiff,                    <u>REPORT & RECOMMENDATION</u>

        -against-                   06-CV-4997 (RRM) (RER)

KAD INT'L MARKETING, INC., and
ASHIT KADAKIA (a/k/a Allen Kad),

              Defendant.
----------------------------------------------------X

**RAMON E. REYES, JR., U.S.M.J.:**

      Plaintiff Singapore Recycle Centre Pte Ltd. ("SRC") brought this diversity action against

defendants Kad International Marketing, Inc. ("Kad International" or "Kad") and Ashit Kadakia

("Kadakia") for breach of contract, fraudulent inducement, and conversion. SRC has moved for

summary judgment on the First, Third and Fourth Claims in the complaint. This matter was

referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b)(3). For the

reasons set forth below, I respectfully recommend that SRC's motion be granted in part and

denied in part, and that partial judgment be entered against Kad International and Kadakia,

jointly and severally, in the amount of $238,590, plus prejudgment interest of 9% (accruing as of

March 12, 2005) against Kadakia only.

## **Background**

<u>The Parties</u>

      Plaintiff SRC is a Singapore corporation engaged in the import and export of, *inter alia*,

scrap metal. (Compl. ¶ 8.) Defendant Kadakia (a/k/a Allen Kad) is the president and founder of

defendant Kad International, a New York corporation (*Id.* ¶¶ 9-10, 13).

<u>The Scrap Metal Contracts and Riders</u>

On September 3, 2004, SRC and Kad International entered into a contract for the sale of scrap metal.[1] (Affidavit of Sophia Su ("Su Aff."), Ex. B at SRC00001.) The contract provided that Kad International would sell to SRC 30,000 metric tons of scrap metal at $195 per metric ton, for a total amount of $5.85 million. (*Id.* at SRC00002.) The parties entered into another contract dated October 20, 2004 for the sale of an additional 30,000 metric tons of scrap metal at $195 per metric ton. (Su Aff., Ex. A at SRC00023-24.) In riders to each contract dated October 28, 2004, the parties modified the price in both contracts from $195 to $202 per metric ton. (Su Aff., Ex. A at SRC00043 & Ex. B at SRC00020.) Both contracts required SRC to obtain a Letter of Credit ("LC"), subject to Kad International's approval, for the total contract price within seven banking days from the execution of the contract. (Su Aff., Exs. A and B at ¶ 7(a)-(d) & App. 1, ¶ 3.) In return, Kad International was required to issue an Indemnity Bond upon receipt of the LC. (*Id.* at ¶ 7(g) & App. 1, ¶ 4.) The rider to the October contract set a delivery date "within 75 days after the receipt of the . . . Letter of Credit." (Su Aff., Ex. A at SRC00042.) Both contracts also contained a remedy and damages limitation clause.[2]

---

[1] The contract was signed, however, in October 2004.

[2] The clause provides:

The liability towards the other party is limited to penalties, charges, damages and remedies expressly stated in this contract. Neither side shall raise any claim on the other for losses of use, profit or contracts, indirect and consequential loss arising under the law of contract or tort including negligence and breach of duty.

(Su Aff., Exs. A and B at ¶ 17(e).)

On October 29, 2004, SRC contracted to sell to Xiamen International Trade Group Corporation, Ltd. ("Xiamen International") and Xiamen C&D (collectively, "Xiamen Companies"), 60,000 total metric tons of scrap metal at $225 per metric ton. (Su Aff., Ex. P.)

Performance

On November 9, 2004, SRC's bank, First Commercial Bank of Singapore ("First Commercial Bank"), issued a LC ("November LC") to Kad International's bank, Citibank. (Affidavit of Ashit Kadakia ("Kadakia Aff."), Ex. A.) The November LC allegedly contained various terms not agreed upon, and thus Kad International requested that SRC amend the November LC. (*Id.* at ¶¶ 21-22.) Citibank rejected the November LC, and Kad International arranged for the November LC to be issued to Commerce Bank. (*Id.* at ¶ 23 & Ex. C.)

On December 2, 2004, Kad International requested an advance payment of $200,000 from SRC to defray it costs in obtaining the scrap metal. (Su Aff., Ex. E at SRC00090.) On December 9, 2004, the parties executed riders to each of the original contracts stipulating, *inter alia*, that (1) SRC would pay Kad International $200,000, (2) SRC would issue "back to back" LCs for the full contract prices by December 11, 2004, and (3) Kad International would refund to SRC the $200,000 in full in the event of non-delivery. (Su Aff., Ex. F.) On that same day, SRC transferred $200,000 to Kad International (Su Aff., Ex. E at SRC00107-08), which was deposited into Kad's business checking account, number 7917402609 ("Account 609"). (Plaintiff's Statement of Undisputed Facts ("Pl.'s 56.1 Stmt") ¶ 28; Affidavit of Jonathan Willens ("Willens Aff."), Ex. H at 195.) On December 13, 2004, Kad International transferred $100,000 of that amount into its business savings account, number 8916384103 ("Account 103"). (Pl.'s 56.1 Stmt ¶ 29; Willens Aff., Exs. G at 202 & H at 195.)

3

On December 14, 2004, First Commercial Bank issued a LC ("December LC") to Commerce Bank. (Su Aff., Ex. H at 000035, 37.) The December LC would become operative upon SRC's receipt of Kad International's Indemnity Bond. (*Id*.) The November LC was also issued to Commerce Bank. (*Id.* at 000050.) The parties negotiated amendments to the terms of both LCs (Su Aff., Ex. I), to which Kad International ultimately agreed on December 21, 2004 (*Id.* at SRC 00174).

On December 22, 2004, Kad International issued Indemnity Bonds to SRC in response to both LCs. (Su Aff., Ex. D.) These Indemnity Bonds provided that Kad International would pay to SRC 2% of the contract price ($121,200 for each contract) in the event of non-delivery. (*Id.*) The Indemnity Bonds were set to expire on February 20, 2005. (*Id.*) On December 22, 2004, First Commercial Bank confirmed that the November LC was operative. (Su Aff., Ex. H at 000052.) On December 27, 2004, First Commercial Bank confirmed that the December LC was operative.[3] (*Id.* at SRC00060.)

Despite their acceptance of the amendments to the LCs, Kad International still raised several issues regarding their terms, particularly that they had to be confirmed by Kad's bank. (Su Aff., Ex. I.) On January 11, 2005, a representative of Kad International requested SRC to pay an additional $40,000 for confirmation charges for both LCs. (Su Aff., Ex. G at SRC00247.) SRC transferred $40,000 to Kad International's Account 609 that same day. (Su Aff., Ex. G; Pl.'s 56.1 Stmt ¶ 30; Willens Ex. H at 190, 95.)

---

[3] Thus, the delivery date of the scrap metal had to be March 12, 2005 (75 days after the LC became operative) at the latest. (Su Aff., Ex. A at SRC00042.)

On March 11, 2005, both LCs expired. (Su Aff., Ex. H at 000044, 58.) On that same date, Kad International told SRC that they were experiencing delays in shipping the scrap metal. (Su Aff., Ex. L at SRC00292.) On March 15, 2005, past the delivery date, Kad International requested that SRC extend the LCs. (Su Aff., Ex. J.) Kad International failed to deliver any scrap metal to SRC. (Pl.'s 56.1 Stmt ¶ 20.) Consequently, SRC alleges that as a result of Kad International's failure to deliver the scrap metal, it was unable to fulfill its obligations in its contracts with the Xiamen Companies. (Pl.'s Memo Supp. Summ. J. at 17.) SRC also incurred bank charges amounting to SGD 127,557.71 (approximately $78,500) as a result of LC negotiations with the Xiamen Companies. (Pl.'s 56.1 Stmt ¶ 26; Su Aff., Ex. Q.)

On April 14, 2005, SRC demanded that Kad International refund the $240,000 in costs and confirmation charges it paid on December 2, 2004 and January 11, 2005. (Su Aff., Ex. N.) On November 7, 2005, Kad International sent to SRC post-dated checks made out to "Singapore Recycle (PTE) Ltd." totaling $240,000. (Su Aff., Ex. C at SRC00065, 67-68.) On November 17, 2005, Kad International requested that SRC cancel the previous checks, and sent to SRC additional post-dated checks for the same amount, this time made payable to SRC's correct name. (*Id.* at SRC00066, 69-70.) Kad International subsequently stopped payment on all checks before they were deposited by SRC. (Pl.'s 56.1 Stmt ¶ 22.)

<u>Discussion</u>

I.     <u>Summary Judgment Standard</u>

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the

moving party to demonstrate the absence of a genuine issue of material fact. *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981). In addition, the court must resolve all ambiguities and draw all reasonable inferences in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If, however, the opposing party fails to make a showing of an essential element of its case for which it bears the burden of proof, summary judgment will be granted. *Celotex*, 477 U.S. 323; *Smith v. Half Hollow Hill Cent. Sch. Dist.*, 349 F. Supp. 2d 521, 524 (E.D.N.Y 2004).

To overcome a motion for summary judgment, the opposing party must show that there is an issue of material fact that is in dispute. That is, the disputed fact must be one which "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 242. If the opposing party does not set forth specific facts showing that there is a genuine issue for trial, summary judgment is appropriate. Fed. R. Civ. P. 56(c).

II.     The Requirements of Local Rule 56.1

Local Rule 56.1 provides:

(a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.

(c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of

the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

(d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, *must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).*

(Emphasis added).

"The purpose of a Local Rule 56.1 statement is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). A court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Id.* (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)).

III.    Analysis

A.    Defendants' Local Rule 56.1 Statement is Deficient

As an initial matter, defendants' Rule 56.1 Statement does not comply with the clear requirement of Local Rule 56.1(d) that "each statement controverting any statement of material fact, must be followed by a citation to evidence which would be admissible." Indeed, none of the statements in Defendants' Rule 56.1 Statement is supported by a citation to any evidence at all, let alone evidence which would be admissible. (*E.g.*, Defendants' Rule 56.1 Statement ("Defs.' 56.1 Stmt"), ¶ 9 ("Defendants deny the statement contained in paragraph "9" of Plaintiff's Statement.")). This failure cannot be overlooked, especially in light of the fact that the defendants' very same Statement contains assertions of "Additional Material Facts" which do contain citations to evidence. (*E.g.*, Defendants' Local Rule 56.1 Statement of Additional

Material Facts, ¶¶1-3.)  As a result of this omission, defendants' Rule 56.1 statement is wholly

inadequate and must be disregarded. *E.g., Larsen v. JBC Legal Group, PC*, 533 F. Supp. 2d 290,

297 (E.D.N.Y. 2008); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 227 (S.D.N.Y. 1999) (citing

*Titan Indem. Co. v. Triborough Bridge & Tunnel Auth., Inc.,* 135 F.3d 831, 835 (2d Cir. 1998));

*see also Cooper v. Gottlieb*, No. 95 Civ. 10543, 2000 WL 1277593, at *4 (S.D.N.Y. Sept. 4,

2000) (deeming the statements contained in movants' Rule 56.1 statement admitted where

non-movants failed to cite to or submit any evidentiary support for the statements in their Rule

56.1 statement in opposition to motion).

  B.  <u>First Claim for Relief – Kad International Breached the Contracts with SRC</u>

  SRC argues that Kad International breached the contracts by failing to deliver the scrap

metal as agreed.  Under New York law, the elements of a breach of contract claim are: "(1) a

valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages

resulting from the breach." *Dupler v. Costco Wholesale Corp.*, No. 06 Civ. 3141 (JFB), 2008 WL

321776, *14 (E.D.N.Y. Jan. 31, 2008) (quoting *Macaluso v. U.S. Life Ins. Co.*, No. 03 Civ. 2337

(GEL), 2004 WL 1497606, at * 3 (S.D.N.Y. July 2, 2004)).  Critically, Kad International admits

that it entered into valid contracts with SRC, that were never terminated (Defs.' 56.1 Stmt, ¶¶ 1-

2, 13), and that it failed to deliver the scrap metal to SRC (*Id.*, ¶ 20).  Thus, the only questions

are (1) whether SRC fully performed and (2) whether and to what extent SRC was damaged as a

result of Kad International's breach.

  1.  <u>The "Requirement" of "Confirmed" Letters of Credit</u>

  In opposition to SRC's summary judgment motion, Kad argues that notwithstanding its

admitted failure to perform under the contracts, there remains a genuine issue of material fact as

to whether its performance should be excused because SRC may have breached a material condition precedent to Kad's performance by failing "to provide Letters of Credit in compliance with the terms of the subject contracts." (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defs.' Br.") at 1.)  Although Kad cites to a number of examples of how SRC's letters of credit were deficient (*id.* at 5-9), it acknowledges that it ultimately "accepted the substantive terms of [SRC's] Letters of Credit, [but] at no time did it waive the *requirement* that the Letters of Credit be confirmed." (Kadakia Aff., ¶ 48 (emphasis added).)  Thus, Kad's sole argument in opposition to this aspect of SRC's summary judgment motion is that SRC materially breached a condition precedent to Kad's performance by failing to provide confirmed letters of credit as required by the contracts.[4]

In deciding a motion for summary judgment, courts look to the plain meaning of the contractual language, "giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Palmieri v. Allstate Insurance Co.*, 445 F.3d 179, 187 (2d Cir. 2006); *see also Mellon Bank, N.A. v. United Bank Corp. Of New York*, 31 F.3d 113, 115 (2d Cir. 1994) (determining whether contract is ambiguous is a matter of law to be decided by court).  "Ambiguity resides in a writing when - after it is viewed objectively - more than one meaning may reasonably be ascribed to the language used." *Id.*  If contractual language is ambiguous and subject to alternative reasonable interpretations, intent becomes an issue of

---

[4] *E.g.*, Defs.' Br. at 9 ("*the Letters of Credit still had to be confirmed*.  As the Letters of Credit were being issued by a foreign bank, it was still necessary to have a bank confirm them, in effect, adding its promise to pay to the Letters of Credit"), 15 ("material issues of fact exist as to whether Kad's reasonable rejection of the *unconfirmed* Letters of Credit comported with the terms of the Contracts and the standard practice in the industry"), and 16 ("But for the defects in the Letters of Credit and the fact that they could not be *confirmed pursuant to the Contracts*, . . .") (emphases added).

fact, and summary judgment is not appropriate. *Id.* The burden is upon the movant to "establish

that a contractual provision is not susceptible of at least two fairly reasonable meanings." *Wards*

*Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985). Here, there is no question

that the contracts themselves did not unambiguously require SRC to provide "confirmed" letters

of credit.

By their own terms, the contracts required SRC to provide an "unconditional, irrevocable

transferable operative documentary Letter of Credit."[5] The term "confirmed" is conspicuously

absent from the contracts. Apparently, Kad would have the Court believe that "unconditional,

irrevocable and transferrable" letters of credit are synonymous with "confirmed" letters of credit.

They are not. A letter of credit, whether unconditional, irrevocable and/or transferrable, is issued

by a *single* bank and is an obligation to pay to a beneficiary a specified amount upon the

beneficiary's presentation of conforming documents. NY UCC §§ 5-102(10), 5-106 (2001). A

"confirmed" letter of credit is one on which at least *two* banks are obliged to make payment: the

issuing bank and the confirming bank. *See* NY UCC § 2-325 ("[t]he term 'confirmed credit'

means that the credit must also carry the direct obligation of ... an agency which does business in

---

[5] Paragraph 7(b) provides in its entirety:

(B) The type of bank instrument as payment guarantee to be furnished by the
Buyer: an unconditional, irrevocable transferrable operative documentary Letter of
Credit shall be issued by the buyer's bank directly to the Seller's Bank. The
Buyer's bank shall issue in favor of the Seller 1 (one) Letter of credit, in
accordance with the terms provided in Appendix No. 1 hereto. The operative
Letter of Credit will be issued within 7 (SEVEN) banking days from the date of
signing this contract otherwise a breach thereof will be declared and subject to
demand under clause 7e.

(Su Aff., Ex. A and B at ¶7(b).)

the seller's financial market"); NY UCC § 5-107 and Comment 2 ("a beneficiary who has

received a confirmed credit has the independent engagements of both the issuer and the

confirming bank").  Thus, when viewed objectively, more than one meaning may not reasonably

be ascribed to the language used in the contracts, and therefore the contracts unambiguously do

not require that the letters of credit "had to be confirmed."

Further, the December 9th modifications of the contracts also did not unambiguously

require that the letters of credit be confirmed.  The modifications, which were made at Kad

International's request, permitted SRC to provide "back to back" letters of credit rather than

"unconditional" letters of credit. (Su Aff., Ex. F at ¶ 2(a) ("A back to back LC bearing the

amount of USD $5,960,000 shall be issued as instrument for the payment of the balance mount

[sic] immediately latest by December 11, 2004.").)  A "back to back" letter of credit is where a

master letter of credit is issued by the ultimate purchaser to his agent or supplier (in this case

SRC), and the agent or supplier then issues a second letter of credit to the seller (Kad).  The

agent's/supplier's letter of credit provides that payment to the seller is subject to receipt of final

payment on the master letter of credit. (Willens Decl., Ex. E at 126-28.)  Notably, the

modification does not require that the "back to back" letters of credit had to be confirmed.

Kad International's reliance on the "sample" letter of credit annexed as Appendix No. 4

to the contracts as proof that the letters of credit "had to be confirmed" is misplaced. (Defs.' Br.

at 4.)  The sample itself does not unambiguously state that the letter of credit must be confirmed.

Rather, it indicates that "[a]ll bank charges, Documentary Letter of Credit confirmation charges

in connection with this Letter of Credit are for the account of the applicant."  The reference to

"confirmation charges" does not unambiguously indicate that the parties intended that the letters

of credit "had to be confirmed." More importantly, the contract does not expressly incorporate Appendix No. 4 as material term. As Kadakia himself notes, Appendix No. 4 is merely a "sample" letter of credit that could be used. (Kadakia Aff., ¶11.) Strikingly, the contract does expressly incorporate Appendix No. 1 as a material term. (Su Aff., Exs. A and B, at ¶7(b) ("The Buyer's bank shall issue in favor of the Seller 1 (one) Letter of Credit, *in accordance with the terms provided in Appendix No. 1 hereto.*").) Appendix No. 1, entitled "Procedure and Terms," contains three references to the letter of credit, none of which mention whether the letter of credits must be confirmed. (*Id.,* Exs. A and B at Appendix No. 1, ¶¶ 3-5.)

Additionally, Kad's argument cannot be saved by the purported "standard practice in the industry" requiring confirmed letters of credit. (Defs.' Br. at 15.) Putting aside the fact that Kad International has not established that there is any such "standard practice in the industry," it is a basic tenet of contract law that custom and practice cannot alter the unambiguous terms of a contract. *Webb v. Kenney*, 234 F. Supp. 2d 197, 201 (E.D.N.Y. 2002); *76 North Assocs. v. Thiel Mgmt. Corp.*, 518 N.Y.S.2d 174, 177, 132 A.D.2d 695, 697 (App. Div.-2d 1987); *Michael J. Torpey, Inc. v. Con Ed*, 470 N.Y.S.2d 426, 427, 99 A.D.2d 484, 484 (App. Div.-1st 1984).

Although the contracts themselves do not unambiguously require that SRC's letters of credit be confirmed, the parties' performance raises questions as to whether SRC subsequently agreed to provide confirmed, or at least "confirmable," letters of credit.

Under New York law, parties may modify a contract by course of performance. *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 613 N.E.2d 159, 162, 81 N.Y.2d 174, 179, 597 N.Y.S.2d 284, 287 (1993). "Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms."

*Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718, 75 A.D.2d 350, 354 (App. Div.-2d 1980); *see also Becker v. Faber*, 19 N.E.2d 997, 998, 280 N.Y. 146, 148-49 (1939) (holding that contractual obligations cannot be modified without the consent of the party that has assumed the obligation). For a course of performance to demonstrate mutual assent to a modification, it must be "unequivocally referable" to the modification. *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926 (1977); *All-Year Golf, Inc. v. Prods. Investors Corp.*, 310 N.Y.S.2d 881, 885, 34 A.D.2d 246, 250 (App. Div.-4th 1970). Modifications to a contract need not be supported by additional consideration when the modification is in writing and signed by the party against whom it is sought to be enforced. N.Y. General Obligations Law § 5-1103 (McKinney 2001). Consideration is necessary to prove the existence of an oral modification of a written agreement. N.Y. General Obligations Law § 15-301.

Again, the contracts were executed on September 3 and October 20, 2004. SRC's original letter of credit, which was issued in non-negotiable form on November 9, 2004, contained a provision clearly stating that it would be issued *without confirmation*. (Kadakia Aff., Ex. A at ¶ 49.) After receiving this letter of credit, Kad International suggested several revisions, but not to that provision. (Kadakia Aff., ¶ 21.) In other words, Kad did not object to the fact that the letter of credit would be unconfirmed. Thereafter, over the next month, the letters of credit underwent further revisions at Kad's request. (Kadakia Aff., ¶¶ 22-39.) It was not until December 15, 2004, that Kad ever complained that the letters of credit were not confirmed. (*Id.* at ¶ 40.) SRC did not immediately agree to this clearly new request:

This was discussed earlier in our telephone conversation.

> 1. Confirmation - The DLC must be a confirmed documentary Letter of Credit and the confirmation charges should be to Buyer's Account. *This is still outstanding as unresolved* and I have forwarded you the name of the issuing bank and its details.

(Su Aff., Ex. I at SRC00129 (emphasis added).)

Subsequently, however, SRC agreed to work with Kad International to get the letters of credit confirmed. On January 7, 2005, SRC agreed that the letters of credit had to be confirmed, and even agreed to pay part of the confirmation charges:

> As for the confirmation of the 2 LCs, we have been informed by the buyers that the Bank has advised them to have the LCs confirmed from the beneficiary's end. Hence, we would like to request you to ask your bank to do the confirmation. Singapore Recycle Centre will bear the charges (less USD 5,000) for each LC. The charges can be either be [sic] deducted from the USD 100,000 advance payment or wired to you. We hope you can attend to this matter from your end today so that we can proceed with the rest of the loading arrangements.
>
> If this arrangement is agreeable, SRC will issue a letter to cover for the payment *and also acknowledge the agreement for the confirmation from your bank*.

(Su Aff., Ex. I at SRC00238 (emphasis added).) The very next day SRC acknowledged that it would "work on the LC confirmation in Singapore come first thing Monday morning." (Kadakia Aff., Ex. J.)

What the foregoing makes clear, indeed undisputed, is that while the parties' written contracts did not require that SRC provide confirmed letters of credit, SRC subsequently agreed to provide letters of credit that could be confirmed by Kad's bank at SRC's expense.

2.   The "Requirement" of Letters of Credit, However Denominated, Was Not a Condition Precedent to Kad International's Performance

Although the parties' subsequent performance indicates that SRC agreed to provide letters of credit that Kad's bank could confirm, SRC argues that it is immaterial because Kad's

performance was not contingent on SRC providing letters of credit at all, even ones that had to be confirmed. (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Br.") at 14-15.) In other words, SRC argues that providing letters of credit, however denominated, were neither express conditions precedent to Kad's performance nor material terms under the contracts. Kad disputes such an interpretation of the contracts, and argues that its performance was excused because SRC materially breached a condition precedent. (Defs.' Br. at 13 ("Kad International's Performance Under The Contracts Was Excused as a Result of SRC's Failure to Perform a Material Condition Precedent").)

The determination of materiality of breach is an issue of law for the Court to decide. *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997). A breach of contract is material if it goes "to the root of the agreement between the parties" or to "the essence of the contract." *Wechsler v. Hunt Health Systems, Inc.,* 198 F. Supp. 2d 508, 526 (S.D.N.Y. 2002) (citing *Frank Felix Associates, Ltd.*, 111 F.3d at 289).

The New York Court of Appeals has summarized the law of conditions precedent as follows:

> A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises . . .. Conditions can be express or implied. Express conditions are those agreed to and imposed by the parties themselves. Implied or constructive conditions are those imposed by law to do justice. Express conditions must be literally performed, whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient . . .. In determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition. This interpretive preference is especially strong when a finding of express condition would increase the risk of forfeiture by the obligee.

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690-91, 636 N.Y.S.2d 734 (1995). "[C]onditions [precedent] are not favored under New York law, and in the absence of unambiguous language, a condition [precedent] will not be read into the agreement." *Ginnett v. Computer Task Group*, 962 F.2d 1085, 110 (2d Cir. 1992); *see also Kidder Peabody & Co., Inc. v. Unigestion Intern., Ltd.*, 903 F. Supp. 479, 501 (S.D.N.Y. 1995) (holding that "a contractual duty is not to be construed as a condition precedent unless the language of the contract clearly imposes such a condition."). It is for the Court to decide as a matter of law whether an express condition precedent to performance exists under the terms of a contract. *Rooney v. Slomowitz*, 784 N.Y.S.2d 189, 192, 11 A.D.3d 864, 865 (App. Div.-3d 2004).

The unambiguous terms of the contracts make clear that Kad's performance was not expressly conditioned upon SRC providing letters of credit that could be confirmed by Kad's bank. For the same reasons, SRC's alleged breach was not material, and therefore did not excuse Kad's performance.

Several provisions in the contract describe Kad International's obligation to ship the scrap metal to SRC. (Su Aff., Exs. A and B, ¶¶ 1-2 , 5.) For example, the contracts provide that Kad International "herewith sells and [SRC] herewith purchases STEEL MELTING SCRAP - USED RAID R50 - R65 as per ISRI standars (hereinafter called "Goods") in accordance with the specifications and quality described in this contract." (Su Aff., Exs. A and B at ¶ 1(a).) Similarly, the contracts provide that Kad "shall deliver the goods under the following conditions: CNF destination in accordance with INCOTERMS 2000" and "within the period in accordance with the Delivery Schedule, Appendix No. 3, hereto." (*Id*. at ¶¶ 2 and 5, respectively.)

Notably absent from all of these provisions is any mention of Kad's shipment of goods being conditioned upon SRC providing a letter of credit, or terms such as "if," "unless," or "until," which New York courts have accepted as unequivocally indicating that a parties' performance is conditioned upon some other event. *MHR Capital Partners LP v. Presstek, Inc.*, No.1 14, 2009 WL 1765986 (June 24, 2009) ("We have recognized that the use of terms such as 'if,' 'unless' and 'until' constitute 'unmistakable language of condition [precedent].'") (citing *Oppenheimer*, 86 N.Y.2d at 691); *see also* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.2 (3d ed. 2004) ("Parties often use language such as 'if,' on condition that,' 'provided that,' 'in the event that,' and 'subject to' . . . but other words may suffice."). Because the contracts were drafted by Kad International, (Kadakia Aff., ¶¶ 5, 7, 18), any ambiguity in their terms, although there does not appear to be any, must be construed against Kad, *McCarthy v. American Intern. Group, Inc.*, 283 F.3d 121, 122 (2d Cir. 2002) ("New York follows the well established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter.") (internal quotations and citations omitted). Similarly, any ambiguity must be resolved in favor of finding no condition precedent to Kad's performance. *E.g., LaSalle Bank Nat. Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003) ("The law generally resolves any ambiguities in favor of a promise rather than a condition precedent.") (citing *Oppenheimer*, 86 N.Y.2d at 691).

Other provisions in the contracts also indicate that providing letters of credit were not conditions precedent to Kad's performance, nor was SRC's failure to provide confirmed letters of credit a material breach. The contracts provide that as a "payment guarantee," SRC will furnish an "unconditional, irrevocable transferable operative documentary Letter of Credit," to be

issued directly from SRC's bank to Kad International's bank. (Su Aff., Exs. A and B at ¶ 7(b).)

The "payment guarantee" also provides that the letters of credit were to be issued "within 7

(SEVEN) banking days from date of signing [the] contract otherwise a breach thereof [could] be

declared and subject to demand under clause 7e." (*Id.*)  Paragraph 7(e) provides:

> In the event that the Buyer fails to issue the Letter of Credit in compliance with
> clause 7a, then, payment for the full amount of shipment value shall be made
> **<u>100% at sight of demand at the buyer's bank without protest</u>** as a contract
> breach and as agreed liquidated damages.

(*Id.*, ¶ 7(e)) (emphasis in original).  The contracts provide further that "[s]hould payment not be

received according to schedule under this contract and [Kad International] should declare a

breech [sic] of contract, then, Summary Judgment under the Laws of the United States of

America shall apply and be deemed automatic for the full contract value and liquidated damages

or for any other amount claimed therein . . ." (*Id.*, ¶ 14(c).)

Read together, these provisions clearly and unambiguously set forth a payment system

and nothing more.  Under paragraph 7(b), the parties' first preference was for SRC to provide

letters of credit.  While paragraph 7(b) clearly anticipates the probable use of a letter of credit,

however, the contract also clearly envisions the possibility that an appropriate letter of credit

would not be provided, in which case Kad International would ship the scrap metal and then

demand payment directly from SRC's bank "100% at sight of demand . . . [and] without protest."

(*Id.*, ¶ 7(e).)  If SRC's bank refused to pay, Kad International could then declare a breach and

seek summary judgment in an appropriate forum, which would "be deemed automatic for the full

contract value."[6]  If a confirmed letter of credit was a material term of the contracts, and a

---

[6] The contracts also provide that "[t]he text of the Letter of Credit to be provided by the
buyer's bank shall be subject to approval by the Seller as a *condition* of the Buyer's compliance

condition precedent to Kad Interanational performance, paragraphs 7(e) and 14(c) would be rendered meaningless.

The Court cannot divine a plausible explanation for why the contracts would expressly condition Kad's performance on SRC providing confirmed letters of credit, as Kad argues, yet provide alternatives for how the transaction would proceed in the absence of a letter of credit. Indeed, Kad International's opposition brief is entirely silent on this issue. There simply is no conclusion to be drawn from the contractual language, especially in light of the rules of construction discussed above, other than that providing letters of credit was not contemplated by the parties to be a condition precedent to Kad International's performance, or that SRC's failure to provide letters of credit that could be confirmed constituted a material breach of the contracts.

That conclusion is further buttressed by the fact that the contracts expressly provide that Kad International could not terminate the contracts in the event SRC failed to provide letters of credit:

> Either party may terminate this contract should the other side refuse performance of a substantive contractual obligation *other than by reason of the L/C not being posted by the buyer* . . .

(Su Aff., Exs. A and B at ¶ 15(a) (emphasis added).) If SRC's failure to obtain confirmed letters of credit went "to the root of the agreement between the parties" or to "the essence of the

---

with the present contract." (Su Aff., Exs. A and B at ¶ 7(d) (emphasis added).) Read in isolation this would seem to indicate that the contracts' letter of credit provisions, as modified by the parties' subsequent performance, are material terms and conditions precedent to Kad International's performance. The contracts' provision with respect to how the transaction would occur in the absence of a letter of credit (*Id.* at ¶¶ 7(e) and 14(c)), however, render the isolated reading of paragraph 7(d) unwarranted. The issue is largely moot as Kad International admits that it ultimately accepted the substantive terms of SRC's letters of credit and even forwarded them to Kad's suppliers. (Kadakia Aff., ¶ 48.)

contract," *Wechsler,* 198 F. Supp. 2d at 56, then why couldn't Kad International terminate the contract as a result?

Although the Court need look no further than the unambiguous terms of the contracts, Kad's partial performance makes clear that its performance was not conditioned upon SRC providing confirmed letters of credit, nor was SRC's failure to provide confirmed letters of credit a material breach of the contracts. Critically, on February 4, 2005, after SRC agreed to work with Kad to have the letters of credit confirmed, but after it became clear that the letters of credit could not be confirmed, Kad wrote to its suppliers stating:

> We will provide LCs which will become non-transferable once received by you. The LCs are issued by prime banks and can be reimbursed in any bank in the USA. The LCs *will not be confirmed* as these are issued by prime banks and can be reimbursed through designated banks in USA.

(Kadakia Aff., Ex. J, ¶ 3 (emphasis added).) Thereafter, Kad continued to work toward fulfilling its obligation to ship the scrap metal. (Su Aff., Ex. J at SRC00293.) Why, if it was a material term under the contracts and a condition precedent to Kad's performance, would Kad continue to seek to perform when it became clear that the letters of credit would not be confirmed? Kad has completely ignored these inconvenient undisputed facts in its opposition papers, perhaps acknowledging that confirmed letters of credit did not go "to the root of the agreement between the parties" or were not part of "the essence of the contract." *Wechsler,* 198 F. Supp. 2d at 56.

In any event, it is clear to this Court that confirmed letters of credit were not conditions precedent to Kad International's performance, nor was SRC's failure to provide such letters of credit a material breach of the contracts. The unambiguous terms of the contracts as modified make clear that while confirmed letters of credit were preferred by the parties, they simply were

not required to trigger Kad International's obligation to ship the scrap metal to SRC. The contracts clearly provided a means of payment other than through confirmed letters of credit, and Kad International continued to perform even when it became clear that the letters of credit could not be confirmed. While Kad International ultimately may have been unable to convince a supplier to ship the scrap metal to SRC without confirmed letters of credit, that is not SRC's fault, nor was Kad International's failure to perform excused as a result.[7]

### 3.    Damages Due to Kad International's Breach

SRC argues that it is entitled to a total of $1,728,500 in damages, consisting of $1.38 million in lost profits, $270,000 in "penalties" it paid to the Xiamen companies, and $78,500 in bank charges, due to Kad International's breach of the scrap metal contracts. (Pl.'s Br. at 19, n.3.)[8] Kad International argues that SRC's recovery is limited by the specific terms of the contracts to recovery against the Indemnity Bonds, which have long since expired. (Defs.' Br. at 17-23.) Neither party is correct.

---

[7] Based on my conclusion that the requirement of confirmed letters of credit was not a condition precedent to Kad International's performance and that SRC's failure to provide confirmable letters of credit was not a material breach of the contracts, I find it unnecessary to reach the issue of whether Kad International waived its objection to SRC's letters of credit by continuing to perform under the contracts. (Pl.'s Br. at 15-16.) I will note for the record, however, that I reject plaintiff's argument that by failing to terminate the contracts, Kad International somehow waived the inadequacies in the letters of credit SRC provided. Critically, the contracts themselves prohibited Kad International from terminating them based on the failure of SRC to provide appropriate letters of credit. (Su Aff., Exs. A and B at ¶ 15(a).) As I have said, that provision is strong evidence that the letters of credit provisions were not essential to the contracts.

[8] SRC also seeks $240,000 in advances paid to Kad, which is discussed separately.

a.      SRC's Lost Profits, Bank Charges and Penalties Are Not
        Recoverable

As mentioned previously, the contracts contain a limitation of liability and remedy

provision:

> The *liability* towards the other party is limited to penalties, charges, damages and
> *remedies* expressly stated in this contract.  Neither side shall raise any claim on
> the other for losses of use, profit or contracts, indirect and consequential loss
> arising under the law of contract or tort including negligence and breach of duty.

(Su Aff., Exs. A and B at ¶ 17(e) (emphases added).)  The only specific remedy limitation in the

contracts is the indemnity bond provision in paragraph 7(g), which provides that "[f]or the proper

performance of the contract and as a counter guarantee of the Letter of Credit, the Seller will

issue the Indemnity Bond."  The Indemnity Bonds themselves limit Kad International's liability

to 2% of the contract price in the event of non-delivery.[9]  No other provision in the contracts

expressly limits Kad's liability toward SRC in the event of non-delivery.  In its reply, SRC

argues that since the Indemnity Bonds had already expired by the time Kad failed to ship the

scrap metal, the remedy provision was rendered meaningless and therefore the entirety of

---

[9] The Indemnity Bonds provide in pertinent part:

As security for the due performance of the delivery of 30,000 metric tons of weight, we
furnish this [performance bond] amount to USD$121,2000 **[One Hundred Twenty One
Thousand and Two Hundred US Dollars]** being 2 % of the contract value of shipment
of 30,000MTW ON THE TERMS AND CONDITIONS DESCRIBED IN THIS PB.

We, Seller's [sic], herewith undertake to pay any amount up to USD$121,000 if the
SELLER fails to deliver the ordered goods on the terms and conditions agreed to.

This PB is valid until February 20, 2005, and will become null and void immediately after
that date and of on consequence whether returned to us or not.

(Su Aff., Ex. D at SRC00170) (emphasis in original).

paragraph 17(e) is void, including the prohibition on lost profits and other consequential

damages.[10]  SRC's argument must be rejected.

The New York Court of Appeals has declared that

[a] limitation on liability provision in a contract represents the parties' Agreement
on the allocation of risk of economic loss in the event that the contemplated
transaction is not fully executed, which the courts should honor. . .  [The parties]
may later regret their assumption of the risks of non-performance in this manner;
but the courts let them lie on the bed they made.

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436, 618 N.Y.S.2d 882

(1994) (quoting 5 Corbin, *Corbin on Contracts*, § 1068, at 386 (1964)); *see DynCorp v. GTE*

*Corp.*, 215 F. Supp. 2d 308, 317-18 (S.D.N.Y. 2002); *World-Link, Inc. v. Citizens Telecomm.*

*Co.*, No. 99 Civ. 3054, 2000 WL 1877065, at *5 (S.D.N.Y. Dec.26, 2000); *Peluso v. Tauscher*

*Cronacher Prof'l Eng'rs, P.C.*, 704 N.Y.S.2d 289, 290, 270 A.D.2d 325, 325 (App. Div.-2nd

2000); *Scott v. Palermo*, 649 N.Y.S.2d 289, 290-91, 233 A.D.2d 869, 869 (App. Div.-4th

1996).[11]  Moreover, it is well settled that where a contract contains both a provision limiting

───────────────

[10]     The limitation on remedies in section 17(e) assumes that the indemnity bond will
be available to compensate SRC; the provision waives SRC's claim for lost
profits and other damages in return for "remedies expressly stated in this
contract."  If the indemnity bod is not effective, then section 17(e) is void.
Otherwise, the transaction would be risk-free for Kad International

(Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s
Reply") at 7.)

[11] Courts sometimes depart from this rule in cases of malice, willfulness or gross
negligence. *E.g., Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 461 N.Y.S.2d
746 (1983).  While issues of malice, willfulness, and gross negligence often present questions of
fact, courts have sustained limitation of liability provisions in the context of a summary judgment
motion when the surrounding facts compel such a result. *See, e.g., Net2Globe Intern., Inc. v.
Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 450-51 (S.D.N.Y. 2003) (citations
omitted).  To the extent SRC argues that such conduct is present here, (Pl.'s Reply at 7
("knowing that once the bond had expired defendants could not be held liable for their *gross*

remedies and a provision limiting consequential damages, even within the same paragraph or clause, the provision limiting consequential damages will be enforced so long as it is found not to be unconscionable. This is so even where a question of fact exists concerning the enforceability of the provision limiting remedies. *E.g., Daily News, L.P. v. Rockwell Int'l Corp.*, 680 N.Y.S.2d 510, 510, 256 A.D.2d 13, 13 (App. Div.-1st 1998); *Scott*, 649 N.Y.S.2d at 290-91, 233 A.D.2d at 871-72.

Unconscionability is an issue for the courts, not jury, to decide when the salient facts regarding the issue are essentially undisputed, as they are here. *Id.* Unconscionability has both procedural (absence of meaningful choice) and substantive (unreasonably unfair to one of the parties) aspects. *Lawrence v. Miller*, 901 N.E.2d 1268, 1271-72, 11 N.Y.3d 588, 595 (2008).

Procedural unconscionability "looks to the contract formation process, with emphasis on such factors as inequality of bargaining power, the use of deceptive or high-pressure sales techniques, and confusing or hidden language in the written agreement." *People by Abrams v. Two Wheel Corp.*, 525 N.E.2d 692, 695, 71 N.Y.2d 693, 699 (1988). SRC does not refute Kad's assertion that negotiations were conducted by Sophia Su, who had extensive business experience and was assisted by two expert consultants. (Defs.' Br. at 20.) SRC also never alleges any deceptive or high-pressure techniques, nor does it appear that there is any confusion or hidden language in the consequential damages limitation. Thus, the damages limitation provision is not procedurally unconscionable.

---

*incompetence and mispreprsentations*.") (emphasis added)), I reject that argument. I find little evidence, let alone the absence of a genuine dispute of material fact, to support such a finding.

Substantive unconscionability looks to the terms of the contract to see if they are unreasonably favorable to one party. "Although [NY UCC] prescribes that we are to determine unconscionability as of the time of the making of the contract, we cannot divorce entirely the events which occur later." *Tandy Computer Leasing v. A.T.C. Control Serv., Inc.*, 526 N.Y.S.2d 327, 328 (Sup. Ct. 1988) (quoting *Industralease v. R.M.E. Enter.*, 396 N.Y.S.2d 427, 432, 58 A.D.2d 482, 489-90 (App. Div.-2nd Dep't 1977)). Thus, whether the damages limitation provision is substantively unconscionable must be considered based on the entirety of the case, and not just what the parties knew at the time of contract. SRC's contracts with the Xiamen Companies also limit damages, using virtually identical language as in SRC's contract with Kad. (*See* Su Aff., Ex. A ¶ 17(e), Ex. P ¶ 16.5.) Thus, SRC would be hard-pressed to argue that the same damages limitation provision is substantively unconscionable. Further, contrary to SRC's argument, upholding the limitation of liability provision in the face of the demise of the limited remedy provision would not make the parties' contracts risk free for Kad International. (Pl.'s Reply at 7). As discussed immediately below, Kad is subject to damages notwithstanding SRC's inability to recover its lost profits and consequential damages, or recover against the Indemnity Bonds. Accordingly, the limitation on damages provision is not substantively unconscionable.

Because the damages limitation is not unconscionable, it is enforceable. Thus, all consequential damages are unrecoverable by either party here. SRC is therefore not entitled to the lost profits, penalties, and bank charges that it seeks.

SRC argues that notwithstanding the expiration of the Indemnity Bonds or the absence of

a formal liquidated damage provision in the contracts themselves, "the Court should hold that the

parties intended for Kad International to pay 2% of the contract value as liquidated damages in

the event of non-delivery." (Pl.'s Reply at 8.)  While there is a certain common sense appeal to

SRC's argument, I decline to adopt it.  "[A] liquidated damage clause must be the result of an

*express* agreement between the parties; courts will not read such a clause into a contract by

implication." *Ohanian v. Avis Rent A Car Sys.*, 779 F.2d 101, 109-10 (2d Cir.1985) (emphasis

added) (citation omitted).  *See also Consolidated Rail Corp. v. MASP Equip. Corp.*, 486

N.Y.S.2d 4, 6, 109 A.D.2d 604, 606 (App. Div.-1st 1985) ("A liquidated damages provision may

not be implied and must be agreed to.") (citing *Winkelman v. Winkelman*, 203 N.Y.S. 63, 208

A.D. 68, 69 (App. Div.-1st 1924)).  Because the only reference to Kad's obligation to pay 2% of

the contract price in the event of non-delivery appears in the expired Indemnity Bonds, and the

Bonds themselves were not expressly incorporated into the contracts, there is no legal basis to

hold that the contracts contained a liquidated damages provision.  Further, liquidated damages

are not allowed where contractual language and attendant circumstances provide for the full

recovery of actual damages, because liquidated and actual damages are mutually exclusive

remedies under New York law. *See X.L.O. Concrete Corp. v. John T. Brady & Co.*, 482

N.Y.S.2d 476, 479, 104 A.D.2d 181, 184 (App. Div.-1st 1984) (quoting *McCready v.

Lindenborn*, 172 N.Y. 400, 409, 65 N.E. 208 (1902) (per curiam)).  As discussed immediately

below, SRC can recover its actual damages.

Although not argued by SRC, it is entitled to recover damages under NY UCC § 2-711, which prescribes damages for buyers in sale of goods contracts in the event of non-delivery. As discussed previously, the parties limited their liability to each other "to penalties, charges, [and] damages . . . *expressly stated in the contract[s]*." (Su Aff., Exs. A and B at ¶ 17(e) (emphasis added).) The only express limitation on damages is the prohibition on damages for "losses of use, profit or contracts, indirect and consequential loss arising under the law of contract or tort including negligence and breach of duty." Su Aff., Exs. A and B at ¶ 17(e).) The only other provision in the contracts arguably dealing with damages is paragraph 14(a), which provides that the contracts are "subject to the United States Law," including the UCC. (Su Aff., Exs. A and B at ¶ 14(1).) Common sense therefore dictates that in the event of complete non-delivery after expiration of the Indemnity Bonds, remedies prescribed by the UCC must be available to SRC.

NY UCC § 2-711[12] entitles a buyer to remedies under either sections 2-712 or 2-713. Section 2-712 provides for damages in cases where a buyer "covers" – purchases substitute goods.[13] In such cases, buyers are entitled to the difference between the contract and cover

_____

[12] § 2-711. Buyer's Remedies in General; Buyer's Security Interest in Rejected Goods

(1) Where the seller fails to make delivery . . . the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid (a) "cover" and have damages under [Section 2-712] as to all the goods affected whether or not they have been identified to the contract; or (b) recover damages for non-delivery as provided in this Article (Section 2-713). . .

[13] § 2-712. "Cover"; Buyer's Procurement of Substitute Goods

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover

prices, plus incidental and consequential damages under section 2-715. It is undisputed that SRC did not cover, and therefore damages under 2-712 are not available.[14]

Section 2-713[15] allows the recovery of the difference between the contract price and the fair market value of the goods at the time the buyer learned of the breach.[16] Neither party has addressed the issue of the fair market value of the scrap metal at the time SRC learned of the breach, and thus I cannot make a recommendation as to how much SRC would be entitled to under Section 2-713. Nevertheless, it is clear that SRC is entitled to such damages, and therefore

_____

and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2-715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

[14] Relying on an Official Comment to section 2-712, Kad seems to argue that a genuine issue of fact exists as to whether SRC attempted to cover, and therefore it should not be entitled to damages at this juncture. (Defs.' Br. at 20-22.) Section 2-715(2)(a) limits *consequential damages* (and only consequential damages) in cover situations to those losses "which could not reasonably be prevented by cover or otherwise," but in no way limits any other measure of damages. Here, the contracts themselves prohibit consequential damages, and therefore it is irrelevant whether or not SRC attempted to cover.

[15] § 2-713. Buyer's Damages for Non-Delivery or Repudiation

(1) Subject to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2-715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

[16] It also allows for the recovery of incidental damages (which SRC has not alleged exist) and consequential damages (which are prohibited by the terms of the contracts). *See* NY UCC § 2-713(1).

the parties should be permitted the opportunity to present evidence and argument on the fair market value of the goods at the time SRC learned of Kad International's breach, and SRC should be awarded as actual damages the difference between the fair market value and the contract price.[17]

*        *        *

For the foregoing reasons, I respectfully recommend that SRC's motion for summary judgment be granted in part with respect to its First Claim for Relief. Although SRC should not be awarded damages at this juncture, the parties should be permitted a brief period to conduct discovery and present evidence on the difference between the contract price and the fair market value of the scrap metal at the time SRC learned of Kad International's breach.

### C.    Fourth Claim for Relief – $240,000 in "Stolen" Advances

Relying on the December 9, 2004 riders to the contracts, SRC argues that regardless of whether Kad breached the scrap metal contracts SRC is entitled to summary judgment on its Fourth Claim for Relief – return of $240,000 in advance payments. (Pl.'s Br. at 19-21.) Notably, Kad offers no serious opposition to this aspect of SRC's motion for summary judgment. (*See* Defs.' Br. at 12-13.) Rather, Kad argues that it is entitled to deduct from the advances over $105,000 in "off-sets for expenses incurred it incurred [sic] attempting to fulfill its obligations under the Contracts." (*Id.* at 13; Kadakia Aff., ¶¶ 59-64.) Kad International's argument should largely be rejected.

---

[17] In submitting such evidence, the parties should take into account the requirements of NY UCC § 2-723.

As discussed above, on December 9, 2004, the parties executed riders to the contracts.

(Su Aff., ¶ 5; Kadakia Aff., ¶¶ 27-28.)  The riders provide, in pertinent part:

> An advance payment, USD 100,000 will be telegraphically/wired transferred to the account of KAD immediately latest by December 10, 2004.  A back to back LC bearing the amount of USD $5,960,000 shall be issued as instrument for payment of the balance mount [sic] immediately latest by December 11, 2004. That there shall be no additional payments required from the seller.

(Su Aff., Ex. F, ¶ 2(a).)  The riders further provide that "[i]n the event of non-delivery of the above-mentioned goods according to the contract terms, the advance payment of USD 100,000 *shall be returned in full to the buyer upon their first demand without prejudice*." (Su Aff., Ex. F, ¶ 2(d) (emphasis added).)  It is undisputed that SRC provided $200,000 in advance payments to SRC pursuant to the terms of each rider. (Su Aff., ¶¶ 15-16.)  It is also undisputed that Kad International failed to deliver the scrap metal under the contracts, and that SRC demanded that the advance payments be returned.

While the riders unambiguously establish Kad International's obligation to return the $200,000 in advance payments, they are silent with respect to the $40,000 that SRC paid to Kad for the  letter of credit confirmation charges. (Su Aff., ¶ 18 & Ex. G.)  The parties' subsequent email discussions are also silent on the issue of repayment of the bank charges in the event the letters of credit would not be confirmed. (*Id.*, Ex. I; Kadakia Aff., Exs. I and J.)  Nevertheless, SRC argues, without citation to any case law or statute, that on November 17, 2005, Kad International contractually obligated itself to return the confirmation charges when it tendered to SRC a check for $40,000, along with three other checks totaling $200,000 (return of the advance payments). (Pl.'s Br. at 20; Su Aff., Ex. C.)

The Court has found no case law to support SRC's contention that Kad International's mailing of the checks "constituted a [separate] contract to pay that amount to SRC," (*id.*), and that Kad breached that contract when its bank dishonored the $40,000 check in December 2005, (Su Aff., ¶ 44). Again, the contracts, riders and the parties' subsequent communications are silent on this issue. "Where a contract is silent on the subject, courts, employing a 'common sense' approach, must determine what the parties intended by considering the nature, purpose and particular circumstances of the contract know by the parties . . . ." *Awards.com, LLC v. Kinko's Inc.*, 834 N.Y.S.2d 147, 152, 42 A.D.3d 178, 183 (App. Div.-1st 2007). "Words and other conduct are interpreted in light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts § 202(1) (1981). When checks are sent with no explanation as to why, "[t]he check creates a presumption of payment of a debt . . . ." *Kiser v. Bailey*, 400 N.Y.S.2d 312, 315, 92 Misc.2d 435, 440 (Civ. Ct. 1977) (*citing Nay v. Curley,* 21 N.E. 698, 113 N.Y. 575 (1889)).

Applying these common sense rules of construction to the circumstances surrounding the $40,000 in letter of credit confirmation charges, there can be no reasonable interpretation other than that the parties intended that they be returned in the event the letters of credit could not be confirmed. It is undisputed that Kad ultimately paid its bank nothing when it became clear that SRC's letters of credit could not be confirmed. (Willens Decl., Ex. E at 161-65.) Moreover, explicitly recognizing its obligation to return the $40,000 to SRC, Kad International mailed a check for that amount not once, but twice. (Su Aff., Ex. C ("We are returning the total amount of USD $240,000 . . .").) Allowing Kad International to retain the $40,000 would permit it a windfall to which it is not entitled.

Finally, Kad International's reliance on the right to "off-set" over $105,000 in purported expenses from the return of the advances is not only unsupported by citation to any case law, it flies in the face of the unambiguous terms of the riders. The riders provide unequivocally that in the event of non-delivery, SRC would be entitled to return of the "full" amount of the $200,000 in advances "without prejudice." There is simply no qualification whatsoever in the riders to Kad International's obligation to return the full amount of SRC's advances, even in the event non-delivery is caused by some action on SRC's part, although they easily could have been drafted to provide as such. In all, the riders are unambiguous and subject to no reasonable interpretation other than that Kad International should be required to return the $200,00 advance payments to SRC.

The contracts, however, do provide that "[b]ank charges relating to the negotiation of LC documents are for the accounts of the Buyer." (Su Aff., Exs. A and B at ¶ 7(i).) No other provision provides for cost shifting of any other expenses incurred in fulfilling a party's obligations under the contracts. Kad has documented a total of $1,410 in bank charges related to the negotiation of amendments to the letters of credit. (Kadakia Aff., Ex. M.) SRC does not dispute these charges. Thus, Kad should be permitted to off-set this amount from the return of the $40,000 of confirmation charges.

Accordingly, SRC's motion for summary judgment on its Fourth Claim for Relief should be granted to the extent that Kad should be required to return $238,590 of SRC's advances – $200,000 + $40,000 - $1,410.

D.     Third Claim for Relief – Conversion

SRC argues that it is entitled to summary judgment on its Third Claim for Relief for conversion as against both Kad International and Kadakia, jointly and severally, because it is undisputed that defendants used the $240,000 in advance payments not for their intended purposes, but for Kad's other business purposes and for Kadakia's personal expenses. (Pl.'s Br. at 21-24.) Kad International and Kadakia do not dispute that SRC provided them with $240,000 in advances, and that the advances were never returned. (Defs.' Br. at 23-25.) Kad and Kadakia also do not dispute that the $240,000 in advances were deposited into Kad's bank accounts from which withdrawals and transfers were made for purposes other than the Kad-SRC contracts. (*Id.*) Defendants argue instead that summary judgment is inappropriate because the money withdrawn and transferred from Kad's accounts did not come from SRC, but from loans from third parties. (*Id.* at 23.)

"The tort of conversion is established when one who owns and has the right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner." *Gortat v. Capal Bros., Inc.*, No. 07-cv-3629 (ILG), 2009 WL 1295509, at *15 (E.D.N.Y. May 5, 2009) (quoting *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475, 211 A.D.2d 379, 384 (App.Div.-1st 1995)). To prevail on a claim of conversion, a plaintiff must demonstrate that: "1) the property subject to conversion is a specific identifiable thing; 2) plaintiff had ownership, possession, or control over the property before its conversion; and 3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ad Rendon Communs., Inc. v. Lumina Ams. Inc.*, No. 04 Civ. 8832 (KMK), 2007 WL 2962591, at *4 (S.D.N.Y. Oct. 10,

2007).  Where money is turned over by a plaintiff to a corporate defendant to be used for a

specific purpose for the benefit of the plaintiff but is not used for that purpose, an action for

conversion may be maintained.  When a plaintiff turns over specific, identifiable funds, the

recipients have an obligation to either utilize the funds in a specific manner or return them.

*Manufacturers Hanover Trust Co. v. Chemical Bank*, 559 N.Y.S.2d 704, 712, 160 A.D.2d 113,

124-25 (App. Div.-1st 1990).

A cause of action for conversion, however, will be dismissed if it is duplicative of a cause

of action for breach of contract, even if a plaintiff meets all the elements of conversion. *Newman*

*v. Mor*, No. 08 CV 658(RJD)(CLP), 2009 WL 890552, at *4 (E.D.N.Y. Mar. 31, 2009); *AD*

*Rendon Communications, Inc.,* 2007 WL 2962591, at *4.  To determine whether causes of action

for conversion and breach of contract are duplicative, courts look to the material facts upon

which each cause of action is based and to the alleged injuries for which damages are sought.

*Newman*, 2009 WL 890552, at *5.

Here, the material facts supporting SRC's cause of action against Kad International for

conversion are almost exactly the same as they are for its breach of contract.  The only difference

between the two is the additional allegation in the conversion claim that Kad and Kadakia

diverted the $240,000 for their own uses.  That additional fact, however, is not enough to render

SRC's conversion claim a separate and distinct claim against Kad International. *AD Rendon*

*Communications, Inc. v. Lumina Americas, Inc.*, No. 04-CV-8832 (KMK), 2006 WL 1593884, at

* 3 (S.D.N.Y. June 07, 2006) (allegation that defendant failed to use contract payments for their

intended purpose and instead kept money for itself was insufficient to plead a separate and

distinct conversion claim).  Since SRC would, in effect, be paid twice if it could recover against

Kad under both its breach of contract and conversion claims, it should not be entitled to recover on its cause of action for conversion, even though it appears to be entitled to summary judgment on that claim.

SRC's conversion claim against Kadakia, however, is a different matter. An individual, though acting for the corporation, may be held liable for the conversion, provided that the individual consummated the conversion through his personal action. *Melnick v. Sable*, 206 N.Y.S.2d 825, 11 A.D.2d 1075 (App. Div.-2d 1960). It is undisputed that Kadakia did, in fact, convert funds from Account 609 for his personal use. For example, defendants admit that Kadakia transferred $30,000 to his personal checking account between December 7 and 16, 2004.[18] (Defs.' Br. at 24.) Thus, Kadakia may be held liable for conversion.

When a corporate officer or president knowingly commits conversion, s/he is jointly and severally liable with the corporation for the tort. *Key Bank of New York v. Grossi*, 642 N.Y.S.2d 403, 404, 227 A.D.2d 841, 842-43 (App. Div.-3d 1996); *Am. Feeds & Livestock Co. v. Kalfco, Inc.*, 540 N.Y.S.2d 354, 149 A.D.2d 836 (App. Div.-3d 1989). In *Kalfco*, the plaintiff brought a conversion action against Kalfco (a corporation) and James and Caroline Holman, the manager and president of Kalfco, respectively. 540 N.Y.S.2d at 355, 149 A.D.2d at 836-37. The court held that Ms. Holman could be held jointly and severally liable with Kalfco for the corporation's conversion as long as she knew that Kalfco was in possession of the converted goods, and that she declined to relinquish the goods. *Id.* at 356, 149 A.D.2d at 837-38. The court in *Grossi* used this rule to impose individual liability upon two corporate officers of Quintro Corporation for the

---

[18] Defendants claim that the $30,000 came from a loan (Defs.' Br. at 24), but bank statements show that Account 609 had only $23,979.52 prior to the deposit of the $200,000 from SRC, and more than $30,000 was withdrawn subsequently (Willens Aff., Ex. H at 195).

corporation's conversion of money. 642 N.Y.S.2d at 404, 227 A.D.2d at 842. There, the plaintiff and Quintro entered into an agreement whereby Quintro sold vehicles repossessed by the plaintiff, and subsequently mailed a check to the plaintiff. *Id.* However, Quintro began experiencing financial problems, and used proceeds from its sales to pay its creditors instead of paying the plaintiff. *Id.* The plaintiff brought suit in conversion against only the two corporate officers of Quintro. *Id.* The court held that they were individually liable for their corporation's conversion of money because (1) the defendants were corporate officers of Quintro, (2) they participated in the commission of conversion, and (3) they were involved in the relevant transactions. *Id.* at 404-05, 227 A.D.2d at 842-44. In fact, because the two corporate officers could be held jointly and severally liable along with Quintro for the conversion, the court stated that Quintro "is [not] a necessary party, for plaintiff can obtain *complete* relief from [the individual] defendants . . . ." *Id.* at 405, 227 A.D.2d at 843 (emphasis added).

Like in *Grossi*, there is no question that Kadakia participated in the commission of conversion and was involved in the relevant transactions, as it was always he who signed the checks. (Willens Aff., Ex. H.) Further, like in *Kalfco*, 540 N.Y.S.2d at 355, 149 A.D.2d at 837, Kadakia is the president of Kad International. (Kadakia Aff., ¶ 1.) Also like in *Kalfco*, 540 N.Y.S.2d at 356, 149 A.D.2d at 837-38, Kadakia declined to return the $240,000, stopping payment on all checks. (Pl.'s 56.1 Stmt ¶¶ 21-23.) Thus, Kadakia is personally liable for conversion of not just the funds that he used for his own personal uses, but also those used by Kad International if the essential elements of conversion can be established. *See Grossi*, 642 N.Y.S.2d at 404, 227 A.D.2d at 843 ("Personal liability will be imposed, however, upon

corporate officers who commit or participate in the commission of [conversion of money], even if the commission or participation is *for the corporation's benefit*." (emphasis added)).

The essential elements of SRC's conversion claim against Kad and Kadakia are not in dispute. SRC provided Kad International with $240,000 in advance payments, which ultimately were not used for their intended purpose. Under the terms of the riders, Kad International had the obligation to return $200,000 in advance payments in full, without deducting any purported expenses. Similarly, given Kad's attempted return of the $40,000 (along with the $200,000), Kad was obliged to return the confirmation charge advance. The $240,000 was deposited into Kad International's bank accounts, but was not returned when SRC requested. Further, Kad and Kadakia withdrew or transferred the funds and used them for purposes unrelated to the Kad-SRC contracts. Kadakia's only defense is that the monies that were withdrawn or transferred from Kad's accounts came from sources other than SRC. That argument must be rejected for two reasons.

First, Kadakia's argument fails as a matter of law. In essence, Kadakia argues that the funds at issue are not sufficiently "specific and identifiable" to support a conversion claim because they were intermingled in accounts containing funds from other sources. It is well-settled that "[m]oney may be the subject of conversion if it is specifically identifiable." *Newbro v. Freed*, 409 F. Supp. 2d 386, 394 (S.D.N.Y. 2006) (quoting *Hoffman v. Unterberg*, 780 N.Y.S.2d 617, 9 A.D.3d 386, 388 (App. Div.-2d 2004)), *aff'd*, No. 06-1772-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007). "The funds of a specific, named bank account are sufficiently identifiable" to establish the tort of conversion regardless of whether they may contain funds from other sources. *Republic of Haiti*, 626 N.Y.S.2d at 475, 211 A.D.2d at 384; *see also Lo*

*Presti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997) (holding that money may be subject of conversion claim even if not segregated and held in separate account); *United States v. New York State Div. of Lottery*, No. 92 Civ. 9001 (BSJ), 2007 WL 1703656, at * 4 (S.D.N.Y. Mar 13. 2007) ("Where money is deposited in a specific bank account, or is a definite amount paid at specified intervals, such money is specifically identifiable for the purpose of a conversion action."). Thus, even if SRC's funds were intermingled with unrelated funds from third parties, that would not defeat SRC's conversion claim. Here, SRC has identified specific sums of money ($200,000 and $40,000) that were wired into Account 609 on two separate occasions. (Su Aff., Exs. E at SRC00108, and G.) SRC also identified a second account ("Account 103") into which was transferred $100,000 of the funds. (Willens Decl., Ex. E at 170-71.) That is more than enough to specifically identify the particular funds to which its conversion claim applies. *Banco Central de Paraguay v. Paraguay Humanitarian Fdn. Inc.*, No. 01 Civ. 9649, 2005 WL 1561504, at *1 (S.D.N.Y. June 30, 2005).

Second, Kadakia's argument fails for a practical reason. Whether or not the withdrawals and transfers were of funds from a separate source is ultimately irrelevant. There is no dispute that as of April 2005, Account 609 had a balance of less than $17,000.[19] (Willens Decl., Ex. H at 239.) By November 2005, Account 103 had a balance of $1,034.02. (Willens Decl., Ex. G at 303.) It is unclear whether either account has a positive balance today, and neither Kad nor Kadakia has refunded whatever balances exist to SRC. Thus, regardless of the source of the funds, Kad and Kadakia converted nearly all of the funds in the accounts, including almost all of SRC's $240,000.

---

[19] It is unclear whether any of the $17,000 remains in the account to date.

Furthermore, it is generally the law of New York to approach bank accounts using the "first in, first out" ("FIFO") rule. *See Merchants' Nat'l Bank of St. Paul v. Santa Maria Sugar Co.*, 147 N.Y.S. 498, 502, 162 A.D. 248, 254 (App. Div.-1st 1914) ("Where a payment is made upon general account with no discretion as to its application, the law applies it to the oldest items.") (quoting *Nat'l Park Bank v. Seaboard Bank*, 114 N.Y. 28, 35, 20 N.E. 632, 634 (1889); *see also Carson v. Federal Reserve Bank of New York*, 254 N.Y. 218, 231-33 (1930) (applying *Nat'l Park Bank* rule in action under Bankruptcy Act); *I-T-E Imperial Corp.-Empire Div. v. Bankers Trust Co.*, 423 N.Y.S.2d 491, 492, 73 A.D.2d 861, 861 (App. Div.-1st 1980) (applying "rule in New York" of FIFO in action under Lien Law); *Lincoln Fin. Servs., Inc. v. Miceli*, 851 N.Y.S.2d 58, slip op. at 4 (Dist. Ct. Nassau 2007) (following "New York's rule of" FIFO in bank account restraining action).

It is undisputed that all $240,000 of SRC's money was deposited into Kad's Accounts *before* the $1 million from other sources. (Willens Aff., Ex. H. at 195, 224, 229 & Ex. G at 295.) At the time, Kad had only $23,964.52 in Account 609. As of April 2005, Kad had balances of less than $17,000 in Account 609 and $1,034.02 in Account 103. (*Id.*, Exs. H at 239 & G at 303.) Thus, applying FIFO, because Kad had balances far below $1 million in total in both of their Accounts, Kad and Kadakia spent all of the $240,000 in advances from SRC prior to dipping into the $1 million from other sources. However, as discussed above, Kad spent $1,410 of SRC's money for bank charges related to the letters of credit, which the contracts permit Kad to do. (Kadakia Aff., Ex. M; Su Aff., Exs. A and B at ¶ 7(i).) Money is converted by a corporate defendant if it is not used for a specific purpose for the benefit of the plaintiff. *Manufacturers Hanover Trust*, 559 N.Y.S.2d at 712, 160 A.D.2d at 124-25. Thus, this $1,410 spent is not

recoverable in conversion, and must be deducted, which leaves a total of $238,590 in converted advances.

SRC also seeks prejudgment interest on its Third Claim of Relief. (Compl. "Wherefore" Clause III.) Prejudgment interest on damages awarded because of conversion is recoverable under NY CPLR § 5001(a).[20] *See Eighteen Holding Corp. v. Drizen*, 701 N.Y.S.2d 427, 428-29, 268 A.D.2d 371, 372 (App. Div.-1st 2000) (awarding prejudgment interest at statutory rate for conversion). I recommend also applying the statutory interest rate of 9% per annum on a simple basis. *See* NY CPLR § 5004 (2007). Section 5001(b) dictates that interest should begin accruing as of "the earliest ascertainable date the cause of action existed . . . ." Thus, I recommend that interest begin accruing as of the delivery date, which I calculate to be March 12, 2005.[21]

Accordingly, I respectfully recommend that Kadakia be held personally liable in conversion for $238,590 plus 9% interest through satisfaction of judgment accruing as of March 12, 2005.

---

[20] The Section provides:

Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

NY CPLR § 5001(a) (2007).

[21] A rider to the contracts between SRC and Kad required a delivery date "within 75 (Seventy five) days after the receipt of the operative Documentary Letter of Credit." (Su Aff., Ex. A at SRC00042.) The LC became operative at the latest on December 27, 2004. (Su Aff., Ex. H at SRC00060.) Seventy five days later is March 12, 2005.

<u>CONCLUSION</u>

For the foregoing reasons, I respectfully recommend that that SRC's motion be granted in part and denied in part, and that partial judgment be entered against Kad International and Kadakia, jointly and severally, in the amount of $238,590, plus 9% interest accruing as of March 12, 2005 against Kadakia personally.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court and the Honorable Roslynn M. Mauskopf within ten business days of receiving this Report and Recommendation.  Failure to file timely objections may waive the right to appeal the District Court's Order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).  Plaintiff's counsel is directed to serve by August 10, 2009, a copy of this Report and Recommendation defendants' at their last known address by certified mail, and promptly file proof of service with the Court.

**Dated: August 6, 2009**
      **Brooklyn, New York**

<u>*Ramon E. Reyes, Jr.*</u>
**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**